545 F.2d 583
 In the Matter of MEREDOSIA HARBOR & FLEETING SERVICE, INC.
and River Road Marine Repair, Inc.
FARMERS & TRADERS STATE BANK OF MEREDOSIA, Lien Claimant-Appellant,
v.
Robert M. MAGILL, Trustee-Appellee.
 No. 76-1018.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1976.
Decided Nov. 8, 1976.
 
 Duane D. Young, Mervin L. Beil, Springfield, Ill., for lien claimant-appellant.
 James L. Magill, John B. Hendricks, Springfield, Ill., for trustee-appellee.
 Before FAIRCHILD, Chief Judge, and CUMMINGS and TONE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 This case arises from the denial of two Illinois banks' petitions to reclaim two vessels, allegedly subject to a maritime mortgage, or the proceeds from their sale in the hands of the bankruptcy trustee of the corporate mortgagor.
 
 
 2
 In 1970, John D. Rasco formed two companies, viz., Meredosia Harbor & Fleeting Service, Inc. and River Road Marine Repair, Inc., its wholly owned subsidiary, to build and repair boats. During that year, the corporations were building the Mary Ann, a river towboat, and the Anita Marie, a harbor towboat.
 
 
 3
 In early 1970, Rasco engaged upon a fraudulent scheme to obtain funds from appellant Farmers & Traders State Bank of Meredosia (Meredosia Bank) and its subrogor, Schuyler State Bank of Rushville (Rushville Bank). Rasco opened checking accounts in the corporate names and in his own name in those banks and in another Illinois bank and an Oklahoma bank. During the summer of 1970, he commenced kiting checks among the various banks. The kite was discovered by bank examiners in auditing the Meredosia Bank in early September 1970. Because of the check kite and Rasco's own unsecured borrowings on his account and on each corporation's account from the Meredosia and Rushville Banks, the Meredosia Bank lost $170,000 and the Rushville Bank $130,000.
 
 
 4
 Neither of Rasco's corporations ever had any paid-in capital, and neither issued any stock. Both corporations were insolvent in early September 1970. The Meredosia Bank was aware of Rasco's check kiting as early as July 1970, and the Rushville Bank realized in early September 1970 that Rasco was insolvent and in an overdraft position. There was evidence of connivance between some of the bank officers and Rasco.
 
 
 5
 On October 1, 1970, River Road Marine Repair, Inc., pursuant to the banks' demand, mortgaged the Mary Ann and the Anita Marie to the banks to secure the indebtedness of $300,000, consisting of $170,000 cash previously advanced by the Meredosia Bank and $130,000 cash previously advanced by the Rushville Bank. Attached to the mortgage was Rasco's October 1, 1970 affidavit stating that the mortgage was made by Rasco as president of River Road Marine Repair, Inc.,
 
 
 6
 "in good faith without any design to hinder, delay or defraud any existing or future creditor of the mortgagor (shipowner) or any lienor of the vessel mortgaged; and that this affidavit is made pursuant to the order of the Board of Directors of said corporation."
 
 
 7
 Both vessels were incomplete on October 1.
 
 
 8
 On November 6, 1970, the mortgagor River Road Marine Repair, Inc. and Rasco's other corporation, Meredosia Harbor & Fleeting Service, Inc., filed reorganization petitions under Chapter XI of the Bankruptcy Act. On the same day, they filed petitions to consolidate their Chapter XI proceedings. Consolidation orders were entered the same day by the bankruptcy referee and Alonzo Sargent was appointed as their receiver.
 
 
 9
 On November 20, 1970, the receiver sent a notice to all the creditors listed in the debtor's schedule of creditors, fixing the time and place for the first meeting of creditors and for various subsequent hearings. As sent out, the notice specified that the last date to file claims was June 14, 1971. The final paragraph of the notice referred to the fact that River Road Marine Repair, Inc.'s petition for arrangement had been consolidated with that of Meredosia Harbor & Fleeting Service, Inc. and that the cases were to proceed under one title, viz., In the Matter of Meredosia Harbor & Fleeting Service, Inc., No. S-BK-70-1365. The receiver's summary of liabilities and assets of the consolidated debtors attached to the notice unrealistically valued the Mary Ann at $450,000 and the Anita Marie at $135,000. The debtors' personal property schedule filed by Rasco on December 14, 1970, listed the Mary Ann's incomplete value as "unknown" and the Anita Marie's incomplete value as $80,000. Rasco listed corporate debts of $504,350.08 and $59,132.65, or a grand total of $563,482.73.
 
 
 10
 In the consolidated proceeding, an adjudication of bankruptcy was entered on January 4, 1971, and receiver Sargent was appointed as trustee. Ten days thereafter, the trustee petitioned for leave to sell both unfinished vessels and other property of the consolidated bankrupts. On the following day, the referee in bankruptcy sent a notice to the creditors to show on or before January 25, 1971, why the property should not be sold. On June 25, 1971, he authorized the sale of the bankrupts' property, there having been no contest to the January 15 show cause order. On December 14, 1971, he approved the trustee's sale of the Anita Marie for $21,500. A month thereafter, he approved the sale of the Mary Ann and other miscellaneous personal property of the bankrupt for $25,000.
 
 
 11
 On February 7, 1973, the Meredosia Bank filed an objection to the trustee's January 2, 1973, final report, indicating that it had a maritime mortgage on the two vessels for $300,000, and stating that the trustee's counsel had previously advised the bank that the proceeds of the sale of the two vessels would not be expended until it was determined whether the mortgage was a valid lien. In March 1973, the Meredosia Bank filed a petition to reclaim the vessels or the proceeds of their sale, and a similar reclamation petition was filed in June 1973 by the Rushville Bank.
 
 
 12
 On May 1, 1974, the bankruptcy referee overruled the Meredosia Bank's objections to the final account of the trustee[1] and denied both banks' reclamation petitions. At the same time, he entered supporting findings of fact, conclusions of law and an opinion. In his opinion, the referee noted that the October 1, 1970, mortgage was given for an antecedent debt of $300,000 caused by Rasco's check-kiting scheme. He observed that the bankrupts were hopelessly insolvent at the time of the mortgage transaction. He held that the mortgage on the towboats was void as a preference. He also held that the mortgage was invalid for want of a proper supporting affidavit and because each boat was incomplete when the mortgage was executed. Consequently, both banks' claims were only allowed as general claims.
 
 
 13
 On October 23, 1975, the district court rendered a thorough opinion affirming the referee's order. Judge Wood held that the banks never possessed a valid preferred ship's mortgage because the supporting affidavit was not made in good faith. He also held that the banks had only a voidable preference because they had reasonable cause to believe that the mortgagor River Road Marine Repair, Inc. was insolvent at the time of the mortgage. Other contentions of the banks were overruled. We affirm.
 
 
 14
 The Meredosia bank insists that the bankruptcy court had no jurisdiction to consider the preferred mortgage the banks assertedly obtained on the two vessels under the Ship's Mortgage Act of 1920 (46 U.S.C. § 911 et seq.). The bank maintains that only a federal district court, a court with original jurisdiction in admiralty, may question the validity of a preferred ship's mortgage.[2] However, in the consolidated proceedings involving the mortgagor River Road Marine Repair, Inc., the consolidated debtor was adjudicated bankrupt on January 4, 1971. By that act, the property of the bankrupt passed into the custody of the bankruptcy court. 2 Collier on Bankruptcy P 23.04 (14th ed. 1974). Having first secured custody of the vessels, the bankruptcy court was entitled to retain possession and determine all lien claims asserted against the vessels. 1 Collier on Bankruptcy P 2.10 at 180-181 (14th ed. 1974).[3] Thus the referee in bankruptcy properly reached the validity of the maritime mortgage.
 
 
 15
 An otherwise valid ship's mortgage is granted the preferred status given by 46 U.S.C. § 953[4] only if the conditions of 46 U.S.C. § 922(a)[5] are met. Here the bankruptcy court refused to give preferential status to the banks' maritime lien because Rasco's accompanying affidavit that the mortgage was "made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel", as required by Section 922(a)(3), was itself made in bad faith. The banks would have us construe Section 922(a)(3) in a pro forma manner, viz.: once the affidavit is made the Section's requirement is met without more. If the affidavit is fraudulent, the appellants argue that recourse should be had against the affiant rather than the mortgage. We disagree. The Section 922(a) (3) affidavit requirement demands assurance that the "mortgage is made in good faith." The good faith requirement applies to the mortgage transaction. This creates, in turn, a derivative good faith requirement for the mortgagee. Upon a showing that the mortgagee knew of the mortgagor's bad faith, such knowledge will trigger Section 922(a)(3). Since each of the requirements of Section 922(a) is independently necessary for a ship's mortgage to attain preferred status, the mortgagee's bad faith will defeat a mortgage's aspiration towards preferred status.
 
 
 16
 The district judge marshalled nine factors based on the evidence that negated this good faith requirement:
 
 
 17
 Representatives of both banks agreed on the mortgage.
 
 
 18
 At the time the mortgage was arranged, bankruptcy was contemplated by all parties.
 
 
 19
 The mortgage was agreed upon after the large overdraft developed.
 
 
 20
 Rasco paid off officers of both banks to help get loans approved.
 
 
 21
 As of September 1, 1970, Rasco admits his liabilities were larger than his assets.
 
 
 22
 Duesterhaus, an employee of the Bank of Meredosia in the loan department, heard of the check-kiting scheme in the latter part of September when the IRS and FBI conducted an investigation.
 
 
 23
 Duesterhaus notified Thormahlen and Westphal (President and Vice President of the Bank of Meredosia) as to the overdraft. They replied that Westphal knew what was going on.
 
 
 24
 Pezman, Chairman of the Board of Schuyler State Bank, first questioned the solvency of Rasco around September 10th or 11th and thereafter "it began to snowball."
 
 
 25
 William Stephens, President of Schuyler State Bank, decided Rasco was insolvent long before "it broke."
 
 
 26
 In light of this evidence, the court correctly held that the ship's mortgage did not attain preferred status under Section 922(a).[6] Since the mortgage did not acquire "preferred status" under Section 922(a), the banks obtained no statutory lien on the vessels under 46 U.S.C. § 953. Therefore, Section 67(b) of the Bankruptcy Act (11 U.S.C. § 107(b)),[7] which preserves statutory liens from the voidable preference provision of Section 60 (11 U.S.C. § 96), was inoperative.[8]
 
 
 27
 The trustee asserts that the bankrupt made a preferential transfer, which was voidable by the trustee under Section 60. The elements of a prima facie showing of a voidable preference under Section 60(a)(1)[9] (11 U.S.C. § 96(a)(1) are: (1) a debtor making or suffering a transfer of his property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt thereby resulting in the depletion of the estate; (4) while insolvent; and (5) within four months of bankruptcy; (6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditors of the same class. The banks maintain that a prima facie showing of a Section 60 voidable preference has not been made on the ground that several of the required elements are not satisfied.
 
 
 28
 First, appellant argues as a matter of due process that because the towboats were owned by River Road Marine and because the caption of the bankruptcy adjudication was "Meredosia Harbor & Fleeting Service, Inc." only Meredosia was adjudicated bankrupt, so that the transfer of the boats by River Road Marine was not by the debtor. Appellant's argument has no merit. The Meredosia Bank contends that no notice of the November 6, 1970, consolidation of the two reorganization petitions was given to creditors and that therefore River Road Marine Repair, Inc., the mortgagor, cannot be deemed as having been derivatively adjudicated bankrupt. This is refuted by the record. The consolidation was at the request of each Rasco corporation. The November 20, 1970, notice to all creditors called their attention to the November 6th consolidation order and advised that both cases would proceed under the name of the parent Meredosia Harbor & Fleeting Service, Inc. Because of the consolidation, the bankruptcy adjudication of the parent on January 4, 1971, covered its wholly-owned and jointly-operated subsidiary,[10] River Road Marine Repair, Inc. If the bank wished to object to the consolidation, its counsel was present at the time of the consolidation order and should have objected at that time.
 
 
 29
 Second, the Meredosia Bank disagrees that the mortgage was to secure an antecedent debt. It is true that when a creditor takes and perfects security from an insolvent debtor, he does not receive a voidable preference if consideration was given by the creditor for the security in the form of a loan. 3 Collier on Bankruptcy P 60.19 (14th ed. 1974). But here no new money was lent to the debtor. Rather, the mortgage was for an antecedent debt to the banks of $300,000 stemming from the check-kiting scheme. Appellant claims that the overdrafts permitted between September 10 and September 20, 1970, were allowed on the strength of the already negotiated and agreed upon but not yet issued mortgage. However, both the district judge's and our review of the record indicates that only when the bank examiners' investigation made it necessary to cover the banks' overdraft position did the banks and Rasco consider and approve the ship's mortgage.[11] Therefore, the mortgage secured an antecedent debt.
 
 
 30
 Third, the bank argues that insufficient evidence was adduced at the hearing before the referee to support a finding of insolvency-in-fact at the time of the making of the mortgage. The appropriate definition of insolvency is given by Section 1(19) of the Bankruptcy Act (11 U.S.C. § 1(19)):
 
 
 31
 "A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts."
 
 
 32
 The district judge outlined five excerpts from the record demonstrating insolvency under this standard:
 
 
 33
 Mr. Rasco testified that at the time the mortgage was granted, the probability of bankruptcy had been discussed.Mr. Rasco testified that as of September 1, 1970, he believed that his liabilities were greater than his assets.
 
 
 34
 Eugene Estes, a CPA, testified that both corporations were insolvent during September.
 
 
 35
 William C. Stephens, President of Schuyler State Bank, decided Rasco was insolvent long before "it broke."
 
 
 36
 Basil Humphrey, a CPA, testified that with hindsight the companies appeared to have been insolvent on October 1.
 
 
 37
 We agree with Judge Wood that the record demonstrates that the corporations were insolvent as of October 1, 1970, the date of the execution of the mortgage.
 
 
 38
 Accordingly, the requirements of Section 60(a)(1) were satisfied. The record shows[12] that at the time of the transfer the banks had " reasonable cause to believe that the debtor (was) insolvent" within the meaning of Section 60(b).[13] This preferential transfer was therefore voidable by the trustee so that the proceeds from the sale of the vessels for some $45,000 are now available for the debtor's general creditors.
 
 
 39
 The bank has also raised some objections in the nature of affirmative defenses to the prima facie showing of voidable preference. It relies on the two-year statute of limitations contained in Section 11(e) of the Bankruptcy Act (11 U.S.C. § 29(e)).[14] That provision requires a trustee to sue on claims of the estate within two years of the bankruptcy adjudication. Thus appellant contends the trustee's voiding of the mortgage, even granted that it is a Section 60(a)(1) preference, is time barred. Section 11(e) is not applicable here where the trustee filed no suit on behalf of the debtor. Rather the lienholders asserted their claims against the trustee.[15] As the bankruptcy referee observed, Section 11(e) "does not come into play when (the trustee) defends money in his hands from creditors whose claims would be preferential if successful." The trustee's defense was in the nature of recoupment and therefore not barred by Section 11(e). Cf. Bull v. United States, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421.
 
 
 40
 The bank also complains of trial misconduct before the bankruptcy referee. While the trustee's witness, accountant Estes, may have related to the bank's witness, accountant Humphrey, that the bankruptcy referee had a pre-trial "problem of check-kiting" and of "unjust enrichment," that does not show that the referee had prejudged the case.
 
 
 41
 Nor can we fault the referee for casually remarking that the refusal of two subpoenaed witnesses, Ernest Thormahlen and Harold Westphal, to testify on Fifth Amendment grounds was because "there's something they don't want to tell." The Fifth Amendment provides that "(n)o person * * * shall be compelled in any criminal case to be a witness against himself." (Emphasis supplied.) The Supreme Court has recently reminded us that:
 
 
 42
 "(d)espite its cherished position, the Fifth Amendment addresses only a relatively narrow scope of inquiries. Unless the Government seeks testimony that will subject its maker to criminal liability, the constitutional right to remain silent absent immunity does not arise. An individual therefore properly may be compelled to give testimony, for example, in a noncriminal investigation of himself." Garner v. United States, 424 U.S. 648, 655, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370.
 
 
 43
 The self-incrimination privilege is a personal one. Thus the banks qua corporations may not claim the privilege against self-incrimination with its derivative mandate not to comment on a person's decision to claim the privilege and remain silent (Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106) on behalf of Thormahlen and Westphal.
 
 
 44
 Of course, a civil penalty cannot be imposed upon a witness' exercise of the privilege. Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274; Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. Since Thormahlen and Westphal together own 60% of the stock of the Meredosia Bank (appellant's brief at 25), a colorable argument might be made that any adverse innuendo drawn by the referee concerning their failure to testify which would contribute to voiding the preference and thereby the reduction of the banks' priority in the bankrupt estate and, derivatively, a reduction of the property eventually to be distributed to the officers as stockholders is a penalty against these bank officers.
 
 
 45
 We are not impressed by this tortured logic. The quintessential nature of a corporation is the corporate veil drawn between it and its shareholders. To the extent that the above argument can be read as describing the imposition of a penalty on Thormahlen and Westphal for asserting the self-incrimination privilege, such a "penalty" is too attenuated to come within the structure of the Garrity line of cases. In any event, since bankruptcy is a civil proceeding, the comment on the two officers' silence by the referee operated as an example of individuals being "compelled to give testimony * * * in a noncriminal investigation of (themselves)." Garner, supra, 424 U.S. at 655, 96 S.Ct. at 1183. In addition, Thormahlen's and Westphal's wrongdoing as it impacted on the bankruptcy proceeding was firmly and independently established elsewhere in the record.[16]
 
 
 46
 Finally, since the district court and the bankruptcy referee credited Assistant United States Attorney Pilolla's statement to the referee that there was no reference to grand jury testimony during the proceeding before the referee and no contrary showing has been made, as a reviewing court we cannot sustain the bank's claim that grand jury tax transcripts were unlawfully used by the trustee and should have been turned over to bank counsel for cross-examination use.
 
 
 47
 We conclude that the appellant was not entitled to the $45,000 proceeds of the sale of the vessels. Therefore, the district court's order of October 23, 1975, is affirmed.
 
 
 
 [1]
 On May 30, 1972, the referee appointed Robert M. Magill as successor trustee to the late Alonzo Sargent
 
 
 [2]
 Since we find infra that the October 1 mortgage was not a preferred ship's mortgage under 46 U.S.C. § 922(a), the exclusive original jurisdiction granted to the federal district courts "(u)pon the default of any term or condition of the mortgage" under 46 U.S.C. § 951 for "preferred mortgages" is not applicable. Thus for purposes of our jurisdictional analysis, only more general maritime law principles need be examined to determine whether the bankruptcy court was ousted of its jurisdiction
 
 
 [3]
 Appellant argues that the lien attached to the towboats qua towboats and not as species of the bankrupt's property. This argument claims that since a ship and its owner are sometimes distinct juridical entities in admiralty, a bankruptcy court cannot be in constructive possession of the bankrupt's ship. Despite a penchant for esoterica in the law of admiralty, appellant's construct proves too much. Since the bankruptcy court has the power to restrain an admiralty action in rem against a ship in the court's control, In re J. S. Gissel & Co., 238 F.Supp. 130 (S.D.Tex.1965), the court also has power to adjudicate the status of claims before it. See generally Gilmore & Black, The Law of Admiralty 806-817 (2d ed. 1975)
 
 
 [4]
 Section 953 provides:
 "(a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.
 "(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."
 
 
 [5]
 Section 922(a) provides:
 "A valid mortgage which at the time it is made, includes the whole of any vessel of the United States (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than twenty-five gross tons), shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if
 "(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;
 "(2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;
 "(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;
 "(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and
 "(5) The mortgagee is a citizen of the United States and for the purposes of this section the Reconstruction Finance Corporation shall, in addition to those designated in sections 888 and 802 of this title, be deemed a citizen of the United States."
 
 
 [6]
 We need not consider another reason to defeat preferred status advanced by the referee, i. e., the vessels were incomplete and had fraudulent documentation when the mortgage was executed, so that the mortgage did not include "the whole of any vessel of the United States" or the documentation required by Section 922(a)
 
 
 [7]
 Section 67(b) provides:
 "The provision of section 96 of this title (Section 60 of the Bankruptcy Act) to the contrary notwithstanding, statutory liens in favor of employees, contractors, mechanics, landlords, or other classes of persons, and statutory liens for taxes and debts owing to the United States or to any State or any subdivision thereof, created or recognized by the laws of the United States or of any State, may be valid against the trustee, even though arising or perfected while the debtor is insolvent and within four months prior to the filing of the petition initiating a proceeding under this title by or against him. Where by such laws such liens are required to be perfected and arise but are not perfected before bankruptcy, they may nevertheless be valid, if perfected within the time permitted by and in accordance with the requirements of such laws, except that if such laws require the liens to be perfected by the seizure of property, they shall instead be perfected by filing notice thereof with the court."
 
 
 [8]
 The district judge also held Section 67(b) inapplicable because any lien obtained by the banks was made by agreement and therefore not a "statutory lien" as defined in Section 1(29a) of the Bankruptcy Act (11 U.S.C. § 1(29a)) and as used in Section 67(b). Since the banks had obtained no valid lien on the vessels, this point need not be decided on appeal either
 
 
 [9]
 Section 60(a)(1) provides:
 "A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."
 
 
 [10]
 River Road Marine Repair, Inc.'s petition for consolidation described it as the wholly-owned subsidiary of Rasco's other corporation
 
 
 [11]
 See, e. g., Tr. Vol. 1 at 61-62 (Rasco); Vol. 2 at 200-203 (Rasco); Vol. 5 at 85, 87 (Chrisman, Director of the Meredosia Bank)
 
 
 [12]
 See text immediately preceding note 6 supra
 
 
 [13]
 Section 60(b) provides:
 "Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property or, if it has been converted, its value from any person who has received or converted such property, except a bona-fide purchaser from or lienor of the debtor's transferee for a present fair equivalent value: Provided, however, That where such purchaser or lienor has given less than such value, he shall nevertheless have a lien upon such property, but only to the extent of the consideration actually given by him. Where a preference by way of lien or security title is voidable, the court may on due notice order such lien or title to be preserved for the benefit of the estate, in which event such lien or title shall pass to the trustee. For the purpose of any recovery or avoidance under this section, where plenary proceedings are necessary, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction."
 
 
 [14]
 In pertinent part, Section 11(e) provides:
 "A * * * trustee may, within two years subsequent to the date of adjudication * * *, institute proceedings in behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy."
 
 
 [15]
 Of course, the trustee was not required to file a formal complaint to initiate the avoidance of the preference since the property in question was already within the bankruptcy court's jurisdiction. See 2 Collier on Bankruptcy P 23.04(2) (14th ed. 1974)
 
 
 [16]
 See, e. g., Trustee's Exhibits 1, 16; Bank's App. 138; Trustee's App. 3-5