The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**,
Plaintiff–Appellee,

v.

**S.S. AMERICAN LANCER, S.S. AMERICAN AQUARIUS, S.S. AMERICAN APOLLO, S.S. AMERICAN LYNX and S.S. AMERICAN ASTRONAUT, their engines, tackle, apparel, furnishings, equipment and appurtenances, in rem, Defendants,**

**and all Related Claims to Vessels and Complaints–In–Intervention,**

**General Electric Capital Corporation, Claimant–Intervenor–Appellant,**

**United States Lines, Inc., Debtor and Debtor In Possession, Claimant–Appellee.**

No. 610, Docket 88–7589.

United States Court of Appeals, Second Circuit.

Argued Jan. 3, 1989.

Decided March 21, 1989.

Nathan J. Bayer (Eugene J. O'Connor, Freehill, Hogan & Mahar, New York City, of counsel), for claimant-intervenor-appellant.

Corinne Ball (Kevin P. Hughes, Judy G.Z. Liu, Weil, Gotshal & Manges, New York City, Sheldon A. Gebb, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., of counsel), for plaintiff-appellee.

Robert L. Poster (Michael C. Lambert, Gilmartin, Poster & Shafto, New York City, of counsel), for claimant-appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This case involves a $92 million typographical error. Appellant General Electric Capital Corporation ("GECC"), appeals from Judge Owen's order, reported below at 686 F.Supp. 469 (S.D.N.Y.1988), that granted appellee Prudential Insurance Company of America's ("Prudential") cross-motion for summary judgment regarding the extent of Prudential's first preferred ship mortgage on eight vessels. GECC, a beneficiary of a second mortgage on the same vessels, sought to limit Prudential's first preferred mortgage to $92,-885.00 based on a typographical error in an amendment to that mortgage. All parties agree that Prudential and United States Lines, Inc. ("U.S. Lines"), the mortgagor, intended that the mortgage amendment state the amount as $92,885,000.00 and that GECC's second mortgage was specifically intended to be subordinate to the Prudential mortgage. Nevertheless, GECC argues that the relevant provisions of the Ship Mortgage Act of 1920 ("SMA"), 46 U.S.C.App. §§ 911 et seq. (1982 and Supp. IV 1986), mandate that the amount reflected by the typographical error, $92,-885.00, be determinative of the extent of Prudential's first preferred ship mortgage. We affirm.

## BACKGROUND

The facts are undisputed. On April 12, 1978, Prudential loaned approximately $150,000,000.00 to U.S. Lines. This loan was made pursuant to: (i) a note agreement dated April 10, 1978 (the "original note agreement"); (ii) a financing and security agreement dated April 10, 1978 (the "original Prudential financing agreement"); and (iii) the documents, including various ship mortgages (the "1978 mortgages") required by the original Prudential financing agreement to secure the Prudential debt. Among the ships mortgaged were eight Lancer class vessels (the "Lancers").

In 1983, U.S. Lines sought to finance the construction and acquisition of twelve jumbo container vessels (the "econships") at a cost of approximately $570,000,000.00. Because of the original Prudential financing agreement, U.S. Lines could not finance the econships without Prudential's approval and therefore invited Prudential to participate. At that time, the remaining principal on Prudential's earlier loan to U.S. Lines was $126,859,753.54.

Prudential thereafter became GECC's partner in extending to U.S. Lines $114,-000,000.00 pursuant to a trust indenture (the "Trust Indenture"), dated April 12, 1983, under which the United States Trust Company ("U.S. Trust") was the trustee. The $114,000,000.00 served as the downpayment or junior tier of the econship financing (the "equity financing"). Although the equity financing was secured

by the econships, the ship mortgages providing this security were subordinate to ship mortgages securing $460,000,000.00 in senior debt (the "senior econship financing"). In order to provide additional collateral for the equity financing, U.S. Lines granted U.S. Trust a second mortgage on the aforementioned Lancers (the "U.S. Trust mortgages").

Prudential insisted, of course, that these mortgages be subordinated to the 1978 mortgages held by Prudential. Each of the U.S. Trust mortgages thus states that such mortgages are "[subject and subordinate] to the First Preferred Ship Mortgage ... between The Prudential Insurance Company of America ... and the Shipowner...." In addition, Article V of each of the U.S. Trust mortgages includes a subordination provision that declares:

> Notwithstanding any other provision of this Mortgage, the rights of the Mortgagee hereunder are expressly made subject and subordinate in all respects to the First Mortgage and the right, title and interest in and to the Vessel and the liens created thereby in favor of the respective prior mortgagee.

Moreover, U.S. Trust closed the econship financing by delivering to Prudential a letter in which U.S. Trust pledged to continue the subordination of its mortgages to the mortgages held by Prudential and limited the remedies available to U.S. Trust under its mortgages.

As a result of the econship financing, each of the agreements concluded between Prudential and U.S. Lines in 1978 was altered as follows: (i) the original note agreement was restated as the 1983 note agreement, dated April 21, 1983, and the notes issued pursuant to the original note agreement were cancelled in favor of notes issued pursuant to the 1983 note agreement; (ii) the original Prudential financing agreement was amended (the "Prudential financing agreement"); and (iii) the 1978 mortgages were replaced by a fleet mortgage titled the First Preferred Ship Mortgage, dated April 21, 1983 (the "Prudential mortgage"). These agreements were executed concurrently with the Trust Indenture and

the U.S. Trust mortgages. Subsequently, the Prudential mortgage was filed and recorded with the Coast Guard and endorsed on the Lancers' appropriate documents. Only after that process was completed were the U.S. Trust mortgages filed, recorded and endorsed in the same manner.

By 1986, U.S. Lines had reduced the outstanding principal balance of the Prudential debt to $92,885,000.00. At that time, however, U.S. Lines informed Prudential and other creditors that U.S. Lines anticipated difficulty in meeting its future payment obligations. Consequently, Prudential, GECC and the holders of the econships' senior mortgages (collectively the "key lenders") agreed to a restructuring of U.S. Lines' debt conditioned on the consent of each key lender to the form of the restructuring. Pursuant to this agreement, amended drafts of the financing agreements governing the econships' senior debt, the Trust Indenture and the Prudential debt (the "key moratorium documents") were circulated to each of the key lenders. Along with these drafts, U.S. Lines circulated a joint consent form (the "Master Consent") which was to be executed by each key lender in order to fulfill the condition of universal consent. Both Prudential and GECC executed the Master Consent.

The key moratorium document relevant to the Prudential debt was the amendment to the Prudential financing agreement. That document expressly states on its first page that as of January 1, 1986, the outstanding principal balance of the Prudential debt was $92,885,000.00. In addition to amending the Prudential financing agreement, however, Prudential and U.S. Lines also amended the Prudential mortgage (the "corollary ship mortgage amendment"). The two parties intended the amendment to effect the following two substantive changes to the Prudential mortgage: (i) all references in the Prudential mortgage to the Prudential financing agreement were to be amended to refer to the Prudential financing agreement as amended in 1986; and (ii) section 31 of the Prudential mortgage was to be amended to record the reduction in the outstanding balance of the Prudential debt to $92,885,000.00.

The first purpose was successfully achieved. The second was not and that failure spawned this litigation. The amendment inadvertently amended section 33 instead of section 31 of the Prudential mortgage and, more importantly, stated that the outstanding balance of the Prudential debt was $92,885.00 instead of $92,885,000.00. Section 3 of the amendment to the Prudential mortgage stated, however, that: "Except as amended by this Amendment, the Original Mortgage shall continue in full force and effect." Consequently, according to the combined terms of the Prudential mortgage and the corollary ship mortgage amendment, the outstanding balance of the Prudential debt was both $126,859,753.54 (paragraph 31 of the Prudential mortgage) and $92,885.00 (section 2 of the corollary ship mortgage amendment).

In addition, paragraph six of the corollary ship mortgage amendment stated that the purpose of that amendment was to "reflect the changes in the [Prudential financing agreement] effected by [the 1986 amendment to that agreement]." Consequently, a copy of the amendment to the Prudential financing agreement, which, as noted above, correctly stated the outstanding balance of the Prudential debt to be $92,885,000.00, was attached to the corollary ship mortgage amendment (which gave $92,885.00 as the amount) as Exhibit A. The corollary ship mortgage amendment, with the amendment to the Prudential financing agreement attached as Exhibit A, was subsequently recorded and endorsed on the Lancers' documents by the Coast Guard.

In spite of the restructuring, U.S. Lines' financial difficulties continued. In September of 1986, the First Boston Corporation ("First Boston"), U.S. Lines' financial advisor, circulated a report concerning U.S. Lines' debt structure and assets. That report was distributed to GECC and correctly noted that the outstanding balance of the Prudential debt was $92,885,000.00. The key lenders and U.S. Lines failed to come to any further agreement, however, and on November 24, 1986, U.S. Lines and its affiliated companies filed a petition for relief pursuant to Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (1982 and Supp. IV 1986), in the bankruptcy court for the Southern District.

At the bankruptcy proceeding, Prudential contended that it possessed a first preferred ship mortgage on the eight Lancers securing an outstanding debt balance of $92,885,000.00. The debtor (U.S. Lines and its affiliated companies), GECC and U.S. Lines' other creditors claimed that Prudential's first ship mortgage was preferred only in the amount of $92,885.00. In May 1987, the bankruptcy court lifted the automatic stay on the five Lancers in New York Harbor and permitted Prudential to arrest and pursue foreclosure on these vessels.[1] The bankruptcy court did not, however, allow Prudential to retain the proceeds from the sale of the vessels. In March 1988, Prudential and the debtor reached an agreement by which the debtor abandoned its opposition to Prudential's claim of a first preferred ship mortgage in the amount of $92,885,000.00 in exchange for 17.5% of the amounts Prudential would receive from the sale of the Lancers. The bankruptcy court approved this settlement over GECC's objection. Prudential then initiated foreclosure proceedings in the Southern District of New York pursuant to the *in rem* procedures of the SMA.

At the *in rem* proceeding GECC raised the preference issue by moving for partial summary judgment declaring the amount of Prudential's first preferred ship mortgage to be $92,885.00. Prudential opposed the motion and cross-moved for summary judgment and an order declaring its first preferred ship mortgage to be in the amount of $92,885,000.00. The district

---

1. The present action originated in the Southern District of New York and only concerns five of the eight ships on which Prudential holds a preferred first mortgage. These are the five ships Prudential was able to arrest in New York Harbor. Prudential arrested the other three ships while they were in San Francisco Harbor and they are the subject of an action in the United States District Court for the Northern District of California. That court, however, has indicated that the result of this appeal will control that proceeding.

court granted summary judgment in favor of Prudential.

## DISCUSSION

■ The sole issue is whether the Ship Mortgage Act of 1920, 46 U.S.C.App. §§ 911 *et seq.*, dictates that the amount of Prudential's first preferred ship mortgage be governed by the erroneous figure recorded on the corollary ship mortgage amendment. GECC concedes that the amount cited in the corollary mortgage amendment as the value of Prudential's first preferred ship mortgage, $92,885.00, was the product of a purely clerical error and that the relevant parties, Prudential and U.S. Lines, intended the corollary mortgage amendment to state that Prudential possessed a first preferred ship mortgage in the amount of $92,885,000.00. GECC also concedes that it: (i) knew at all times that the Prudential debt amounted to $92,-885,000.00; (ii) knew that U.S. Lines and Prudential both intended to execute, and believed that they had executed, an agreement extending to Prudential a first preferred ship mortgage in the amount of $92,885,000.00; and (iii) did not know until well after U.S. Lines went into bankruptcy that the corollary mortgage amendment mistakenly stated the amount of Prudential's first preferred ship mortgage to be only $92,885.00.

If the preference is recognized in the amount intended by all the parties, therefore, GECC will have lost nothing to which it was entitled or that it expected to gain from the freely negotiated transactions described above. If the typographical error reduces Prudential's preference by some $92 million, however, GECC will be the beneficiary of a major windfall. We know of no general principle of law or equity that would in any way support what is so obviously an unjust result. GECC's contentions clearly would fail were contract law at issue, *see, e.g., Libby, McNeil & Libby, California Canners & Growers v. United Steelworkers of America,* 809 F.2d 1432, 1434 (9th Cir.1987); *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.,* 766 F.2d 1089, 1092 (7th Cir.1985), and equity, we believe, abhors a windfall.

■ There is of course no non-constitutional reason why legislation cannot override universally recognized principles protecting parties from mistakes harmless to others such as typographical errors and avoiding wholly unjust windfalls to third parties. Courts should not impute such an effect to particular legislation, however, absent convincing evidence that it was so intended. GECC would have us treat the SMA as legislation having just such an effect. It thus argues that in order to obtain a preferred ship mortgage pursuant to 46 U.S.C.App. § 922, and thereby a preferred maritime lien pursuant to 46 U.S.C. App. § 953, a mortgagee must complete absolutely without error the procedures set out in Section 922. That section stated at the pertinent times:

(a) Requirements

A valid mortgage ... shall ... have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this Appendix, if—

(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

(2) The mortgage is recorded as provided in section 921 of this Appendix, together with the time and date when the mortgage is so endorsed;

(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;

(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and

(5) The mortgagee is a State, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States, or is a citizen of the United States, and for the purposes of this chapter the Reconstruction Finance Corporation shall, in addition to those

designated in sections 888 and 802 of this Appendix, be deemed a citizen of the United States.

(b) Preferred status

Any mortgage which complies in respect to any vessel with the conditions enumerated in this section is hereafter in this chapter called a "preferred mortgage" as to such vessel.

(c) Indorsements

There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

(1) The names of the mortgagor and mortgagee;

(2) The time and date the indorsement is made;

(3) The amount and date of maturity of the mortgage; and

(4) Any amount required to be indorsed by the provisions of subsection (e) or (f) of this section.

(d) Collector of customs

Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, if such collector is directed to make the indorsement by the collector of customs of the port of documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

Because all of the procedures designated by the statute were satisfactorily followed except for the typographical error, GECC does not dispute that Prudential's mortgage has preferred status in the amount of $92,885.00. As for the remaining $92,792,-115.00, however, GECC denies any preference. To support this position, GECC relies on case law, the legislative history of the SMA, and a recent recodification of the SMA.

We begin our examination with the case law. GECC contends that *Morse Drydock & Repair Co. v. STEAMSHIP NORTHERN STAR*, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926), established the principle that in order to obtain a preferred ship mortgage a creditor must comply absolutely with the conditions set out in Section 922. *Morse Drydock* involved a dispute concerning the relative priorities of a ship mortgage and a repairman's lien. The mortgage was executed and recorded on April 11, 1920, and a certified copy was left with the ship's papers on September 23, 1920. The mortgage was not endorsed by the collector of customs, however, until June 27, 1921. Meanwhile, the repairs were made between November 14 and November 27, 1920. The Court concluded first that both the lien and the mortgage were valid. The only issue therefore concerned priority. The mortgagee argued that by leaving the copy of the mortgage with the ship's papers the mortgagee had fulfilled its obligations under the SMA and was entitled to priority even though the collector of customs had failed to endorse the mortgage. The Court rejected this argument, stating:

> Obviously the statute taken literally may work harshly if by any oversight or otherwise the collector does not do his duty, and excellent reasons could be found for charging the petitioner with notice of a document that both was recorded and was kept with the ship's papers. But the words of the statute seem to us too clear to be escaped. The mortgage is made preferred only upon compliance with all the conditions specified, one of which is indorsement, and the maritime lien is preferred if it arises before the recording and indorsement of the mortgage. We see no room for construction, and there is nothing for the courts to do but to bow their heads and obey.

*Morse Drydock*, 271 U.S. at 555–56, 46 S.Ct. at 590.

GECC argues that *Morse Drydock* holds that the creation of a preferred mortgage requires absolute compliance with each pro-

vision of the SMA no matter how unjust the outcome. We disagree. *Morse Drydock* held only that where the endorsement requirement is entirely unfulfilled, a mortgage will not be afforded priority status. The Court did not address the variety of issues arising where an endorsement was made but contains clerical errors such as a misspelling of the mortgagee's name or a misplaced decimal point.

The other decisions relied upon by GECC are equally inapplicable. In *Matter of Meredosia Harbor & Fleeting Service, Inc.*, 545 F.2d 583, 587–88 (7th Cir.1976), *cert. denied*, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977), the mortgagee accepted an affidavit concerning the mortgagor's intentions that it knew was made in bad faith. The error in *Meredosia* was not a technical non-compliance but an outright attempt to evade the fundamental principle of Section 922 that priority not be used as a means of avoiding other financial obligations. That act, amounting to a fraud on third parties, is hardly analogous to a typographical error where, as here, the only competing claimant is a second mortgagee who lent with full knowledge of the facts and after direct negotiations with the first mortgagee.

The relevant case law thus requires only that the mortgagee make a good faith effort to complete each of the steps set out by Section 922, at least so long as no other party is misled to its detriment.

We turn now to GECC's claim that the legislative history of the SMA supports its position. For this, GECC relies almost exclusively on remarks made by Ira Campbell, who served at one time as admiralty counsel to the Shipping Board and who also drafted the bill that eventually became the SMA, at the House and Senate hearings concerning the SMA. Specifically, GECC relies upon the following comment made by Mr. Campbell at the Senate hearing:

> Supposing a ship out of Portland goes to the Willamette Iron Works for repairs to her boilers. The liens for those repairs would be a lien arising out of contract, which would be subordinate to the lien of the mortgage. When the vessel comes to the Willamette Iron Works for repairs the owner of the works may be in doubt as to whether the general credit of the owners is sufficient for him to do this work and he may be in doubt as to whether he wants to do the work unless he finds there is going to be sufficient security behind his maritime lien upon the vessel for repairs to justify his making them. How is he going to ascertain it? Not by being compelled to send to the home port of the vessel in New York and have the mortgage there inspected, as he would today if he wanted to ascertain the condition of the mortgage record, but *all he has to do is go aboard that vessel and ask the master to produce the certificate of registry, and upon that certificate will be disclosed to him the exact state of the mortgage indebtedness.*

(emphasis added). *Establishment of An American Merchant Marine: Hearings Before the Senate Committee on Commerce*, 66th Cong., 2d Sess. 942 (1920) (*See* Appellant's Br. at 15). Even if we were to treat testimony at hearings as a powerful indicator of congressional intent, nothing in this passage compels the conclusion that clerical errors will vitiate an attempted compliance with Section 922 where legitimate interests of third parties are not at stake. On the contrary, this passage deals entirely with persons whose knowledge is based solely on documents on the vessel and illustrates only that Congress's purpose in enacting Section 922 was to require that prior mortgagees give adequate notice to subsequent creditors. In his statement to the House Committee considering the SMA, Mr. Campbell thus noted that the endorsement procedure was intended to "give a ready means of notice [of a mortgage] to those who deal with ships so that they won't have to run down to the customhouse." *Recordings of Mortgages on Vessels and Subordinating Maritime Liens Upon Vessels for Necessaries To The Liens of Mortgagees: Hearings On H.R. 8422 Before The House Committee On Merchant Marine and Fisheries*, 66th Cong., 1st Sess. 4 Parts, Part 2, at 71 (1919) (*See* Appellant's Br. at 16).

It can hardly be denied that where, as here, a party has actual knowledge of a prior mortgage because its loan was in fact negotiated with the first mortgagee, the purpose of Section 922 in providing notice underlined by Mr. Campbell has been entirely satisfied. The legislative history of the SMA thus provides no support whatsoever for appellant's position.

Lastly, we confront GECC's claim that the recent recodification of the SMA, Public Law No. 100–710, 102 Stat. 4735, adds support to the contention that Section 922, until the effective date of the recodification, embodied an absolute compliance test. The recodification eliminated the need for an endorsement and recognized that a mortgage can achieve preferred status by substantially complying with new recordation requirements. GECC argues that the recodification embodies Congress's belief that Section 922, as originally drafted, embodies the absolute compliance test. GECC thus cites a statement made on the floor of the House by Representative Hutto, the floor manager of the bill, that:

> While there is divided judicial authority as to whether or not the doctrine of substantial compliance was applicable to the recording of instruments in the past, compare *In re Alberto*, 823 F.2d 712 (3d Cir.1987), with *The Emma Giles*, [15] F.Supp. 502 (D.Md.1936) the new language makes it clear that in the future, substantial compliance with the recordation provisions will suffice. The issue of whether or not Congress should change the statutorily imposed and judicially enforced requirement of strict compliance with the endorsement provisions of the former statute, see e.g. *Morse Drydock & Repair Co. v. The Northern Star*, 271 U.S. 552 [46 S.Ct. 589, 70 L.Ed. 1082] (1926), is mooted by the elimination of endorsement as a prerequisite of the creation of a preference.

134 Cong.Rec. H10,741 (daily ed. Oct. 21, 1988). Because we have already concluded that *Morse Drydock* does not control the present case, Representative Hutto's statement that the new legislation overrules *Morse Drydock* is of no aid to GECC.

We therefore find nothing in precedent or in the SMA itself suggesting that the generally applicable principles of law protecting parties from the effect of clerical mistakes harmless to others and avoiding unjust windfalls do not apply to the determination of preferences under the SMA. We hold that where, as here, a party attempts in good faith to perform each of the procedures required by Section 922, the only error is one that all parties concede to be clerical, and the only competing claimant had actually negotiated a subordinated loan with the mortgagee, the mortgagee possesses a valid preferred ship mortgage in the form the mortgagee and the debtor originally intended.

We therefore affirm the district court.